13-1206, 1230, 117, City of Scarborough, Lillibridge Healthcare Services, Inc. Thank you very much. It's your flight. Right now? Thank you. Will the attorneys who are going to orally argue please come to the podium, introduce yourselves to the court. Attorney for Appellant. Good morning, Your Honor. Ronald Mena on behalf of the Appellant. Mr. Mena. Good morning, Your Honor. Dan Weiss on behalf of Appellees Lillibridge and Kersedome. Good morning, Your Honors. Wendy Ennerson on behalf of the PGA Lillibridge Defendants. Okay. Appellees, have you decided how you're going to budget your 15 minutes? We have, Your Honor. And how's that going? We're going to share time equally and I'll begin for Appellees. I understand. Okay, Appellant, you have 15 minutes, they have 15 minutes. You must apportion from your time what you'd like to reserve for your rebuttal. Five minutes. Very good. Okay. We'll first hear from the Appellant. Please proceed. Thank you, Your Honor. You may have a minute. One moment. The microphone is not an amplifier. It's a recording device. Keep your voice up so we can hear you. May it please the Court. My name is Ronald Mena, and along with Stephanie Matthews, we represent the Appellant, Sidney Scarborough, in this consolidated appeal. This case arises out of Prudential's decision to sell all of the stock, including a forced liquidation of plaintiff's stock, at the bottom of the real estate market in a quick cash-out sale. The amended complaint alleges that in negotiating and closing the sale, the defendants breached their fiduciary duties to the plaintiff, which resulted in losses to her as a minority shareholder. Additionally, the second amended complaint alleges that the defendants, Lillie Bridge and Curtis Adam, breached their promise to the plaintiff to include her in a change-in-control payment. The CEO and CFO represented the plaintiff that only the three of them were entitled to receive these change-in-control payments as long-term executives. We'll be asking this Court to reverse the 2615 dismissals of the complaints by the trial court. In a cash-out merger, heightened standards both of review and of fiduciary duties apply because it's what's also referred to as a final stage transaction. That is, in a cash-out merger, at the end of the day, a shareholder is left with cash. They don't have any more opportunity to receive value from an ongoing entity, as would happen in a stock-for-stock merger, where you now have an interest in the new entity that presumably has more assets because it's acquired your assets. And because of this, because of the fact that it's a final stage transaction because you only receive cash, the courts have fashioned greater judicial scrutiny and the need for a premium to be paid to the shareholders, basically to pay for them for the lost value of future earnings. It's clear those cases are applicable here. Well, let's get to the heart of the matter. Judge Flynn ruled that you didn't allege facts to support your complaint. I believe, Judge, that we have alleged sufficient. In what way? So with respect to the prudential defendants, since we have to go through each of them, what we have alleged is that they engaged in self-dealing. They engaged by having the timing of the shares at the bottom of the market. Again, this was their decision to sell everyone, everyone's shares, that they came in at the bottom of the market and they said, we're selling. You don't have a choice. We're selling everyone's, not just ours, which was their right to do, but everyone's shares. And in doing that, they then became fiduciaries for the minority. But in the deal that they structured, they structured in a way which benefited them to the detriment of the minority in several different ways. First, there was an allocation of assets, which favored the real estate assets versus the management assets, so that the preferred shares, which are owned by Prudential, were favored so that Prudential would get its value out. Prudential had also been receiving yearly, and this is alleged in the complaint, been receiving yearly payments, which the minority shareholders didn't do, so that at the end they got everything that they put in out and the minority shareholders received substantially less. They didn't receive what's called their fair value. Additionally, what they also did is when they negotiated, they allowed the other defendants, the individual defendants, to basically extract $14.7 million in payments, which is money that came off the top, which decreased the share value that would have gone otherwise to the minority shareholders. So this is money which came off the top. So in a couple of different ways, they've breached their fiduciary duties. It's clearly evident that it's self-dealing because Lilybridge, as a majority shareholder, said, we're selling today. Lilybridge, as the majority board said, we're selling today. And they're on both sides of that transaction. So this was a board decision? It was a board decision. But you sued them as shareholders, right? We sued them both as a majority shareholder and, and it's alleged in Paragraph 40, and as controlling the board. Majority shareholders under Maryland law since the 1920s have been held to a standard that when they exercise or basically tell the company what to do, they then take on a fiduciary duty to the minority shareholders. So they actually have, Prudential actually has two different fiduciary duties. One is as the controlling shareholder telling the company what to do and also as the controlling board members approving what the majority shareholder wanted to do. Are you contending that Judge Flynn ignored that provision or just didn't consider it? I think that there was a misunderstanding below of what we were seeking because he was focused on the $381 million and whether or not we were contending that was enough. And that is not a claim that is set forth in either the amended or the second amended complaint. We are not contesting today the dollar amount of the merger. We are not seeking to undo the merger in any way. What we are saying is that as a result of the merger, the defendants who sat at the table and owed fiduciary duties, both the Prudential and the individuals, who owed fiduciary duties to the minority shareholders, ignored those duties and benefited themselves at the expense of the minority shareholders. Did you allege that in the complaint what the benefit they received to the detriment of your client was? Yes. So as I explained in paragraph 40 of the count one, which relates to Prudential, sets forth how Prudential through its representatives breached its duties, that it had this LEIP, an employee investment program, which basically took the risk from the preferred shareholder, set it out to the common shareholders. So the plaintiff now is basically shifting risk in a way that benefits itself and hurts the minority shareholders, that it approved the sale, that the sale would cause additional losses to the LEIP, the minority shareholders, that it allowed the individual defendants, Lee, Libridge, and Prudis at him, to allocate the assets in a way that benefited Prudential and hurt the minority shareholders. It failed to obtain a fairness opinion or an independent valuation, which is something which is one of the two methods which since Revlon has been required in order to show fairness, to show that there is no conflict of interest, to show that there is no breach of duty, they didn't do that. Was that under Maryland law or just general law? That is, Revlon has been adopted in Maryland law. It's talked about in Schenker, which is also a cash-out deal. There is no question, and I don't think they have any, have raised any issues in the briefs or below, that the Revlon standards don't apply in a cash-out deal. They do. Every Maryland case that's talked about a cash-out deal has talked about the enhanced level of judicial scrutiny that goes with it. It's outside of the business judgment rule. It's an enhanced level of scrutiny. So those definitely apply. There is no question about that. Now, with respect to the individual defendants, we've alleged that they have breached their duties in a different way, which is that they came and said, you know what, we think the $381 million is way too low, and unless you pay us some money, we're going to compete against you, we're going to tank the deal, we are going to make your life miserable, pay us this money. Prudential went along with them. They, as officers, this is Lilliebridge and Kersedam, as officers, owe fiduciary duties to the corporation and its shareholders. Lilliebridge, in addition, was also a board member, so he owed those duties as well. So they went and they said, we want this additional money. And they got the money. Lilliebridge got $3 million for trademarks, which were a corporate asset, with no valuation, no independent approval, no outside indicia of any sort of fairness as to how they came up with it. That's a corporate asset. Additionally, we had $7 million of restricted stock and $3 million for non-competition payments. But those came out of and were allocated to the three REITs that were being purchased. Those came off the top. That reduced shareholder value. That's a fiduciary duty because they were negotiating for themselves  Additionally, there was the $1.4 million, the prudential guarantee, which we specifically allege was set up to pay the minority shareholders their premium, the premium that's due in a cash-out sale. That money, 70% of it, went to the officers. As officers, not as shareholders. They had a duty to negotiate and not negotiate on their behalf. In fact, under Revlon and its progeny, once a merger starts, officers aren't allowed to go and negotiate these types of parachute payments. What they have to do is either go to an independent, fully empowered committee, who has the power to hire lawyers, financial advisors, make its own decisions, and say this is what we would like. They didn't do that. If you'd like to have five minutes rebuttal, you best conclude. Thank you, Your Honor. Additionally, there is, and I believe the briefs are very clear on why we believe that there is also a claim for promissory estoppel against the individual defendants. And thank you, Your Honors, for your time and consideration. Five minutes rebuttal. Thank you. Appellee. Yes, Your Honors. Thank you very much. Daniel Weiss, on behalf of Appellees Lillibridge and Kurzudem. Your Honors, there are two counts on appeal directed at these appellees. The fiduciary duty claim, which we just heard about, and the promissory estoppel claim. Judge Flynn correctly dismissed both. The first observation with respect to the fiduciary duty claim that Judge Flynn made that's important here is that the complaint is all over the map in terms of different duties alleged in a conclusory and scattered way. Paragraph 44 of Count 2, which is the heart of this claim, lists in a laundry list seven or eight different types of breach of fiduciary duty. Misappropriating corporate assets, mismanagement, self-dealing, corporate opportunities. It runs the gamut. As Judge Flynn said, this isn't the way that one pleads a breach claim under the Illinois Pleading Standard. Paragraph 44 says, Lillibridge and Kurzudem committed one or more of the following acts. And it goes on to list all of these different things. That's insufficient. Judge Flynn went further, though, and we can go further, too, because the distinction between direct and derivative claims is critical here. It's even more critical given what counsel just said. As your Honors know, a derivative claim is one that says that the corporation has been injured in some way, such as a fiduciary taking a corporate asset or a corporate opportunity. Those are claims that are raised on behalf of the corporation. Ms. Scarborough has not brought any derivative claims. She sues in her own capacity as an individual shareholder, and I believe she's all but conceded that she can bring no derivative claims. There is a narrow direct claim available under some cases, including the Schenker case, but that is a direct claim that goes to the negotiation of the purchase price. The Schenker case in Maryland goes to the negotiation of the purchase price. And what counsel just said is that there's no contention before this Court that there was anything wrong with the $381 million purchase price. That's a very significant concession. Your Honors have seen the transcript before Judge Flynn. That was not a concession that was made before Judge Flynn. Judge Flynn probed Plaintiff's Counsel and probed the factual basis for this so-called price claim, and he found that there was no factual basis alleged. What we've heard this morning is a new theory not presented to Judge Flynn, that there was nothing wrong with the $381 million purchase price. That's fatal to Plaintiff's claims because of the distinction between direct and derivative claims. As the cases tell us, the In Re Golane case from the Delaware Court of Chancery is the leading case. As those cases tell us, it's a derivative claim to say that someone got a side payment or someone took a corporate asset. Even in the context of a corporate merger, it only becomes a direct claim if there's an alleged factual connection between the alleged side benefit and the dollars actually paid in the transaction, the purchase price. And here, there is no factual connection alleged. In fact, we're told that the $381 million price is unchallenged. Now, there's a new phrase used this morning. It's not in the briefs. It wasn't before Judge Flynn that the side payments, quote, came off the top, that they somehow came off the top of the $381 million. I submit to you, Your Honors, there is not a factual allegation in the complaint demonstrating that there's any reason to think that that's true or that there's any factual basis for the claim. There is a conclusory statement throughout the complaint that the dollars in the transaction came from, quote, available transaction proceeds. That's as far as it goes. And after Judge Flynn asked many questions about this theory and examined the complaint very closely, we had a very long argument on the motion to dismiss. Judge Flynn correctly concluded, and I'll quote him, this is at page 121 of the supplemental appendix in the Lillibridge and Kersdom briefing, there was no allegation other than this conclusion about available transaction proceeds, which would support a finding that if those monies had not been paid to Lillibridge and Kersdom, the sale price for the transaction overall would have gone up. That is to say, without a factual connection, without any allegation that this company, the third-party buyer, Ventas, would have paid more than the $381 million, or that there's a factual connection between the transition payments on the one hand and the $381 million on the other hand, there's no direct claim pleaded, whether as a matter of the Illinois pleading standard or as a matter of the distinction between direct and derivative claims. We cite the Golan case from the Delaware Court of Chancery, the Kramer v. Western Pacific case from the Delaware Supreme Court, and the NYMEX case from the Delaware Court of Chancery. All of those cases say, first of all, there's nothing unusual about transition payments when a company buys another company, very often wants to bring management along. And second of all, without a factual connection saying that the executives took something off the table from the shareholders, then there is no direct claim. Here there is a mere conclusion pleaded that all of the dollars must have been part of the same available transaction proceeds. There's nothing further. Also, if we look closely at this off-the-top theory that we heard articulated this morning, it doesn't even make sense under the allegations of the complaint. The more than $7 million of the amounts challenged were in the form of restricted stock from the buyer, from Ventas. And the $381 million, the merger amount, is alleged to have been a cash-out merger. So we have cash consideration on the one hand, $381 million, and then we have restricted stock on the other hand coming from Ventas, the purchaser. There's no allegation as to how those two things relate. And it's a little bit of apples and oranges. It's two completely different forms of consideration. And to say that $7 million in restricted stock came off the top of a $381 million price doesn't make a lot of sense to begin with, and there are no factual allegations to make it so. It's also important for Your Honors to note that the amended complaint, paragraph 20, which is supplemental appendix page 6, alleges that the $381 million price was fixed before there was any discussion of what these gentlemen might receive from their new employer, Ventas, after the transaction. So we have a fixed price, $381 million fixed. And without a factual allegation as to how these gentlemen somehow tampered with those dollars or took things away from those dollars, and there is no such allegation in the complaint, there is no direct claim. Very briefly, Your Honors, on the promissory stopper claim, I would submit to you that the complaint itself alleges facts that doom the claim. They are absolutely inconsistent with a clear and unambiguous promise or with any reasonable reliance. Paragraph 27 and paragraphs 32 of the second amended complaint make clear that Ms. Scarborough herself knew that these gentlemen could not promise her a golden parachute. Ms. Scarborough says on page 38 of her brief on appeal, defendants lacked authority to approve parachute payments. She knew that Mr. Lillibridge and Mr. Kirsten were not the people who could promise her a parachute payment. At most, we're talking about statements about what a committee or a board might do in the future. And as we know from many cases, prophecies or predictions about what people might contingently do in the future cannot support a promissory stopper claim. If Your Honors have no other questions, I want to make sure co-counsel has her time as well. Thank you. Thank you. You have eight minutes left. Thank you, Your Honors. Wendy Anderson on behalf of the PGA majority shareholders. The PGA majority shareholders held 95% ownership in three real estate investment trusts that were sold to an unaffiliated, bona fide purchaser in June 2010. After extensive consideration and a four-hour hearing, Judge Flynn Below correctly ruled that the majority shareholders did not owe a fiduciary duty to plaintiff. Judge Flynn correctly held that the complaint failed to plead the requisite facts to establish that even a duty was owed in these circumstances. Now, the Maryland law governs the substantive allegations of the complaint. And the Maryland Supreme Court has repeatedly held that unless acting ultra-virus, illegally, or in bad faith, a majority shareholder owes no fiduciary duty to a minority. Majority shareholders are not managers of the company. They are not trustees to other shareholders. And in every control party transaction, a presumption of good faith applies. The protections of the business judgment rule apply. And it is the plaintiff's burden to establish and allege specific facts to show that that presumption should not apply. As this Court held in Premier Networks v. Steadheim, a complaint will not survive a motion to dismiss if it only contains conclusions of law and conclusory allegations unsupported by specific factual statement. Now, it is worth noting that this is a 2010 case. Ms. Scarborough was afforded discovery. She had access to the merger documents. And over a year after she files a complaint, she amends her complaint to state a claim for breach of fiduciary duties to a board of directors who may have been affiliated with the PGA entities. The merger was approved by a disinterested majority board. There are no allegations in this complaint of that they acted on an uninformed basis, that they acted in bad faith, or that they somehow stood to gain from this transaction. Now, counsel will have this Court believe that the heightened pleading standards, an entire fairness review, is always warranted in a cash-out merger, and that is simply not the case. The Maryland courts, as well as the Delaware courts, routinely hold that in an entire fairness review, this majority shareholder uses its economic power to receive more favorable consideration than a minority shareholder, or where the transaction involves some self-dealing by the majority. Now, the only disparate benefits alleged in the complaint are that the PGA entities received annual profit distributions, and that is solely by virtue of them being preferred shareholders. Plaintiff admittedly was not. The attachments to plaintiff's complaint reveal that she held only common shares. The other allegations of self-dealing, that the PGA entities approved transaction payments, transition payments, to defendants Lillibridge and Curzium, well, doesn't that reveal what this case is really about? Plaintiff's realization of the consequences of her own decision to give up her right to share in any bonus or any payments that were made to her co-founder and the other executive in the event of a change of control. That occurred in 2008. These other officers and directors received payments which were approved by the majority of a board, a disinterested board, and as the Maryland Supreme Court has held, the PGA entities and majority shareholders have a property right in their shares. They have a right to sell those shares, regardless of the consequence to the minority. They simply cannot use their voting power in a manner in which they stand to gain in some unfair way that the plaintiff has alleged in this complaint. Now, in plaintiff's reply brief, there are multiple assertions of an improper motive. First, that it is improper to raise in a reply brief for the first time, allegations which appear nowhere in a complaint. And second, had plaintiff had these allegations, she was given the opportunity to replete her count. It's in the hearing transcript at C146. Judge Flynn gave plaintiff the opportunity to move to replete her complaint. And rather than doing so, she sought Rule 304A findings and brought this case on interlocutory appeal. This complaint is wholly devoid of any allegations that these majority shareholders owed plaintiff a fiduciary duty. In apparent recognition of that, plaintiff seeks to impose director duties on these majority shareholders. In her complaint in paragraphs 37 and 41, she cites to Section 2405 of the Maryland corporate statute. That statute specifically governs the duties owed by directors of a corporation. In sum, if the panel does not have any questions, I will note with a statement by Judge Flynn, it is simply not a permissible pleading to assert that a plaintiff thinks she may have a cause of action but doesn't know yet. Judge Flynn correctly held that the complaint was utterly devoid of any factual allegations to establish a duty or a fiduciary duty on the part of these majority shareholders. We respectfully request this Court to affirm the trial court's ruling. Thank you. Mr. Mena, you have five minutes. I want to start with something that was just said. At no point below did Judge Flynn offer the plaintiff the opportunity to replead Counts 1 and 2 of the amended complaint. The question that was there at the page was whether or not the dismissal was with prejudice or not, and he said, yes, it was with prejudice with respect to Counts 1 and 2. He then clarified with respect to Count 3, which is the promissory stoppable claim, that we did have the opportunity to replead. We were not given the opportunity below to replead Counts 1 and 2, which is why we are here today instead of having repleaded it and then having it go on. Now, with respect to the Lilybridge arguments, Shanker is very clear. This, and that's a Maryland Supreme Court case, this is a direct claim. She is no longer a shareholder. She was denied by the defendants when she sent letters and alleged in the complaint that they said, hey, you're not a shareholder. You no longer have shareholder status. That in a cash-out merger situation, the plaintiff is not a shareholder. There is no derivative claim because you're not a shareholder. You only have direct claims, and that's what we're alleging is a direct claim to her because the price that she received for her shares was too low because of the defendants' acts, because of their breaches of fiduciary duty. It's a very clear road. Shanker sets out what you have to do. So you're saying the gross purchase price or sale price would have been increased by the $7 million? No. What would happen is... And she would have gotten a bigger share of the increased gross price? So with respect to the monies that went to the individual defendants, and the 280G says that basically it all comes out of the assets of the REITs, not outside of the merger, but it's part of the merger, that those monies would have added to the bottom line to determine the share value that is going to the minority shareholders. It doesn't add a penny more that has to come in the pot. It's just how the pot was split up. So part of the pot went to the individual defendants improperly because of their breaches, and part of the pot went to the plaintiff because it made sure it got paid off in full. So what you have is a table with four people. You have Ventas who said, here's what I want to pay. You have Prudential who was interested in making sure that its shares got taken care of. You have the individual defendants making sure that they were taken care of as officers. And you have the minority shareholders who were represented by, well, they were supposed to be represented by Prudential as the majority shareholder, the whip hand, who made the decision to force the individual minority shareholders to sell to represent them, the fiduciary duty, and then the officers who had a fiduciary duty to represent the minority shareholders, but they didn't do that. And that's what's alleged. That's the self-dealing that's here. That's why this isn't a case where the business judgment rule doesn't apply. The nationwide case, I'm sorry, the MFW shareholders case talks about how you get in a cash-out deal business judgment rule, and you have to do two things. You have to have an independent, fully empowered committee look over and approve the sale, and then you have to have a fully informed vote of a majority of the minority shareholders. Here, we don't have either one. None of the minimally, the recognized minimal standards was used by the defendants here. That was their choice, not ours. Ms. Scarborough was forced to sell. She had no choice. Prudential could have sold its 95 percent and not made us sell, but they forced us to sell. That's why this is different. That's why there is an enhanced judicial review, whether it's enhanced scrutiny or entire fairness. We really don't have to distinguish, but we know we're not in the business judgment rule. Golane and Kramer and Imax, those cases are all distinguishable, and they don't apply, because in those cases, the side payments were different. They didn't come off as we're alleged here in the top. Those weren't cash-out mergers. Golane was a stock-for-stock merger. We have a cash-out merger. We have nothing left for which we can try and hopefully make up some of the improper payments. Additionally, in those cases, the indicia of fairness was present. You either had a vote of a majority of the minority, or you had an individual defendant. We don't have that here. We have interested people approving their own deals. Prudential saying, okay, fine, I know I got to take care of you so that you don't muck up my deal, approving the individual defendants. Prudential taking care of itself. Please conclude. For the reasons stated here today and in the briefs, we ask this Court to reverse the dismissal of the plaintiffs. We ask this Court to dismiss the individuals with prejudice by the trial court. Alternatively, Judge, we believe that the structural weakness that was found by Judge Flynn doesn't exist, and that at a minimum, we should be allowed to replead. Thank you very much. Thank you. The Court is taking this case under advisement. The Court is adjourned.